# RECORD NO. 21-10092

In The
# United States Court Of Appeals
# For The Eleventh Circuit



**COREY MCCLENDON,**
on behalf of themselves and a class of similarly situated persons,
**REGINALD HOLDEN,**
on behalf of themselves and a class of similarly situated persons,
**CHRISTOPHER REED,**
on behalf of themselves and a class of similarly situated persons,

*Plaintiffs – Appellants*,

**v.**

**GARY LONG, in his official capacity and individually,**
**JEANETTE RILEY, individually,**
**SCOTT CRUMLEY, individually,**

*Defendants – Appellees,*

JOHN AND OR JANE DOES, 1-3, individually,
*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA

———————————

## APPELLANTS' OPENING BRIEF

———————————

Mark A. Yurachek, Esq.
Georgia Bar No. 783599
MARK ALLEN YURACHEK & ASSOCIATES, LLC
1344 Lafrance Street, NE
Suite 3
Atlanta, GA 30307
(470) 319-8721

Mark A. Begnaud, Esq.
Georgia Bar No. 217641
ESHMAN BEGNAUD, LLC
315 W. Ponce de Leon Ave
Suite 775
Decatur, GA 30328
(404) 665-9601

*Counsel for Appellants*

## CERTIFICATE OF INTERESTED PARTIES

Undersigned counsel hereby certifies that the following persons may have an interest in the outcome of this case:

Christopher Reed

Reginald Holden

Corey McClendon

NARSOL (National Association for Rational Sexual Offense Laws)

ACLU (American Civil Liberties Union)

ACSOL (Alliance for Constitutional Sex Offender Laws)

Mark Begnaud, Esq.

Mark Yurachek, Esq.

The Honorable Marc T. Treadwell

Sheriff Gary Sheriff Long

Deputy Jeanette Riley

Former Deputy Scott Crumley

Jason Waymire, Esq.

Terry Williams, Esq.

Ben Vaughn, Esq.

Date: March 17, 2021

/s/ Mark Yurachek
Mark Yurachek
Georgia Bar No. 783599

# TABLE OF CONTENTS

**Page**

Certificate of Interested Parties...............................i

Table of Contents..............................................ii

Table of Authorities...........................................v

Statement Regarding Oral Argument.............................xi

Jurisdictional Statement.......................................1

Statement of Issues On Appeal..................................1

Statement of The Case..........................................1

     Statement of Facts.........................................3

     Standard of Review.........................................8

Summary of the Argument........................................9

Argument and Citation of Authority............................10

I.    THE DISTRICT COURT ERRED IN GRANTING APPELLEES' MOTION
    FOR SUMMARY JUDGMENT AND DENYING APPELLANTS' MOTION
    BECAUSE THE SIGNS ARE COMPELLED SPEECH....................10

    A.    The District Court's Order Concerning Compelled
        Speech...............................................10

    B.    Compelling Appellants To Host The Signs Interfered
        With Their Autonomy Over The Message They Wished To
        Convey – Or Not Convey – To The Community...........12

        1.    The First Amendment assures
            speaker autonomy which includes her decision
            as to the content of messages she hosts,
            especially at home...............................12

        2.    The First Amendment protects speakers'
            decisions as to which messages to host,
            particularly at home.............................13

            a.    speakers are most protected
               at home.......................................13

      b.   hosts on private property typically prevail....................................14

      c.   the signs interfered with Appellants' desire to live quietly and in seclusion....15

    3.   Speakers need not speak at all.................17

    4.   Government actors may not speak in a way that compels citizens to respond when they would prefer to remain silent........................19

    5.   The First Amendment distinguishes venues which host a variety of viewpoints from private properties like Appellants' homes..............23

C.   The District Court's Authorities Did Not Require Appellants To Appear To Endorse The Signs' Message In Order To Prove A First Amendment Violation .......25

    1.   <u>Cressman II</u> presumed a close association between the citizen's property and the government message to which he did not object ...25

      a.   the Supreme Court has found compelled speech without considering endorsement.....26

      b.   the reasonable observer test is irrelevant in a pure speech case..........27

      c.   close association is sufficient in the compelled speech analysis.................27

    2.   Compelled subsidy cases are of limited relevance......................................30

      a.   Johanns is not instructive to this case..............................30

      b.   United Foods, Inc. has some Relevance.................................32

      c.   The district court's standards and conclusions were unsupported..............34

D.   Rights-of-Way Are Irrelevant To This Court's Analysis...........................................35

1.   Appellees failed to prove that the signs
     were placed in rights-of-way....................35

2.   Rights-of-way are still on Appellants'
     property.......................................36

3.   The government may not use rights-of-way to
     create an advantage in expressing its views.....37

4.   Sheriff Long is not authorized to place
     these signs in rights-of-way....................38

5.   Sheriff Long's interpretation of the statute
     is expansive...................................40

E.   The Policy Is A Content-Based Restriction On
     Speech, Thus Strict Scrutiny Applies.................42

F.   The District Court Erred In Crediting Long's Self-
     Serving Declaration................................45

Conclusion.................................................50

Certificate of Compliance..................................51

Certificate of Service.....................................52

# TABLE OF AUTHORITIES

**Page**

**UNITED STATES CONSTITUTION**

U.S. Const. Amend. I.......................................*passim*

U.S. Const. Amend. IX........................................41

**FEDERAL STATUTES**

28 U.S.C. §1291..............................................1

**APPELLATE DECISIONS**

*United States Supreme Court*

Agency for Int'l Development v.
Alliance for Open Soc'y Int'l, Inc.,
    570 U.S. 205, 133 S. Ct. 2321, 186 L.Ed.2d 398 (2013).....10

City of Ladue v. Gilleo,
    512 U.S. 43, 114 S. Ct. 2038,
    129 L.Ed.2d 36 (1994)................................*passim*

Cleveland v. Policy Mgmt. Syst. Corp.,
    526 U.S. 795, 119 S. Ct. 1597,
    143 L.Ed.2d 966 (1999)...................................45

Glickman v. Wileman Bros. & Elliott,
    521 U.S. 457, 117 S. Ct. 2130,
    138 L.Ed.2d 585 (1997)............................30,32,33

Hurley v. Irish-Am. Gay, Lesbian &
Bisexual Grp. of Bos.,
    515 U.S. 557, 115 S. Ct. 2338,
    132 L.Ed.2d 487 (1995)...............................*passim*

Johanns v. Livestock Mktg. Ass'n,
    544 U.S. 550, 125 S. Ct.2055,
    161 L.Ed.2d 896 (2005)............................30,31,32

Marvin M. Brandt Revocable Tr. v. United States,
    572 U.S. 93, 134 S. Ct. 1257,
    188 L.Ed.2d 272 (2014)...................................36

Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n,
___ U.S. ___, 138 S. Ct. 1719,
201 L.Ed.2d 35 (2018)................................*passim*

McCullen v. Coakley,
573 U.S. 464, 134 S. Ct. 2518,
189 L.Ed.2d 502 (2014)...................................38

McIntyre v. Ohio Elections Com'n,
514 U.S. 334, 115 S. Ct. 1511,
131 L.Ed.2d 426 (1995)...................................18

Members of City Council of City of Los Angeles v.
Taxpayers for Vincent,
466 U.S. 789,104 S. Ct. 2118,
80 L.Ed.2d 772 (1984)....................................13

Miami Herald v. Tornillo,
418 U.S. 241, 94 S. Ct. 2831,
41 L.Ed.2d 730 (1974)....................................18

Pacific Gas & Elect. Co. v. Pub. Utilities Comm'n of Ca.,
475 U.S. 1, 106 S. Ct. 903, 89 L.Ed.2d 1 (1986).......*passim*

PruneYard Shopping Center v. Robins,
447 U.S. 74, 100 S. Ct. 2035,
64 L.Ed.2d 741 (1980)................................*passim*

Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.,
487 U.S. 781, 108 S. Ct.2667,
101 L.Ed.2d 669 (1988)...............................*passim*

Rumsfeld v. Forum for Academic and
Institutional Rights, Inc.,
547 U.S. 47, 126 S. Ct. 1297,
164 L.Ed.2d 156 (2006)............................15,23,25

Spence v. Washington,
418 U.S. 405, 94 S. Ct. 2727,
41 L.Ed.2d 842 (1974)....................................13

United States v. United Foods, Inc.,
533 U.S. 405,121 S. Ct. 2334,
150 L.Ed.2d 438 (2001)............................32,33,34

United States v. Playboy Entm't Group, Inc.,
    529 U.S. 803, 120 S. Ct. 1878,
    146 L.Ed.2d 865 (2000)...............................43,44

Walker v. Texas Div., Sons of Confederate Veterans, Inc.,
    ___ U.S. ___, 135 S. Ct.2239,
    192 L.Ed.2d 274 (2015)................................35

Wooley v. Maynard,
    430 U.S. 705, 97 S. Ct. 1428,
    51 L.Ed.2d 752 (1977)...............................*passim*

Yates v. United States,
    574 U.S. 528, 135 S. Ct. 1074,
    191 L.Ed.2d 64 (2015)................................39

### *Eleventh Circuit*

Alabama v. U.S. Army Corps of Engineers,
    424 F.3d 1117(11th Cir. 2005).......................45,46

Coleman v. Miller,
    117 F.3d 527 (11th Cir. 1997).........................11

Cooper v. Dillon,
    403 F.3d 1208 (11th Cir. 2005).......................43

Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,
    901 F.3d 1235 (11th Cir. 2018)......................9,34

Leoncio v. Louisville Ladder, Inc.,
    601 F. App'x 932 (11th Cir. 2015)...................49

United States v. Rey,
    811 F.2d 1453 (11th Cir. 1987).......................3

Van T. Junkins & Assoc., Inc. v. U.S. Industries, Inc.,
    736 F.2d 656 (11th Cir. 1984)......................45,48

### *D.C. Circuit*

Tavoulareas v. Piro,
    759 F.2d 90 (D.C. Cir. 1985).........................20

*Second Circuit*

Burns v. Martuscello,
  890 F.3d 77 (2d Cir. 2018)................................18

*Sixth Circuit*

Discount Tobacco City & Lottery, Inc. v. United States,
  674 F.3d 509 (6th Cir. 2012)..........................42,43

*Seventh Circuit*

Entertainment Software Ass'n v. Blagojevich,
  469 F.3d 641 (7th Cir. 2006)..............................42

Deimer v. Cincinnati Sub-Zero Products, Inc.,
  990 F.2d 342 (7th Cir. 1993)..........................47,49

*Ninth Circuit*

Frudden v. Pilling,
  742 F.3d 1199 (9th Cir. 2014)............................25

*Tenth Circuit*

Cressman v. Thompson,
  719 F.3d 1139 (10th Cir. 2013)...........................25

Cressman v. Thompson,
  798 F.3d 938 (10th Cir. 2015).........................*passim*

Franks v. Nimmo,
  796 F.2d 1230 (10th Cir. 1986)..................45,46,48,49

**FEDERAL DISTRICT COURT DECISIONS**

Barham v. Edwards,
  566 F.Supp. 1497 (M.D. Tenn. 1983)......................41

Christie v. Mazda Motor of Am., Inc.,
  ___ F.Supp.2d ___, 2006 WL 2128897 (E.D. Tenn. 2006)......47

Reed v. Long,
  420 F.Supp.3d 1365 (M.D. Ga. 2019)..................*passim*

Reed v. Long,
    ___ F.Supp.3d ___, 2020 WL 7265693
    (M.D. Ga. 2020)........................................*passim*

Taylor Bldg. Corp. of Am. v. Benfield,
    507 F.Supp.2d 832 (S.D. Ohio 2007).......................21

United States v. Brugnara,
    ___ F.Supp.2d ___, 2014 WL 7240678
    (N.D. Cal. 2014).........................................47

Wellard v. U.S. Dep't of Justice,
    ___ F.Supp.2d ___, 2007 WL 951898
    (D. Idaho 2007)..........................................47

Winningham v. U.S. Dep't of Hous. & Urban Dev.,
    371 F. Supp. 1140 (S.D. Ga. 1974)........................47

Wrzeski v. City of Madison, Wis.,
    558 F. Supp. 664, 669 (W.D. Wis. 1983)...................19

Yatzus v. Appoquinimink School Dist.,
    458 F.Supp.2d 235 (D. Del. 2006).........................45

**FEDERAL RULES OF APPELLATE PROCEDURE**

Fed. R. App. P. 4..............................................1

**STATE CONSTITUTIONS**

Ga. Const. Art. 9, §1, ¶III(a)................................41

**STATE STATUTES**

O.C.G.A. § 32-6-50............................................38

O.C.G.A. § 32-6-51.........................................38,39

O.C.G.A. § 42-1-12.....................................*passim*

**STATE APPELLATE DECISIONS**

**Georgia**

Brooks v. Green,
    594 S.E.2d 629, 277 Ga. 722 (Ga. 2004)....................46

Fortner v. Town of Register,
    604 S.E.2d 175, 278 Ga. 625 (Ga. 2004)................48,51

Rainer v. State,
    690 S.E.2d 827, 286 Ga. 675 (Ga. 2010)...................53

**Iowa**

Dinges v. Tollenaar,
    ___ N.W.2d ___, 2002 WL 1840874
    (Iowa App. 2002).........................................31

**OTHER AUTHORITIES**

Black's Law Dictionary (10th ed. 2014)........................36

------- ◊ -------

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument on this matter. The issue of compelled speech remains fluid and evolving in the law. The treatment of sex offenders by government officials is likewise a matter of great public concern that continues to evolve.

------- ◊ -------

## JURISDICTIONAL STATEMENT

The Eleventh Circuit has jurisdiction over this matter pursuant to 28 U.S.C. §1291 and Fed. R. App. P. 4(a)(1). This is an appeal from a final decision by the United States District Court for the Middle District of Georgia, Macon Division. See Reed v. Long ("Reed II"), ___ F.Supp.3d ___, 2020 WL 7265693 (M.D. Ga. 2020).

------- ◊ -------

## STATEMENT OF ISSUES ON APPEAL

1.  *THE DISTRICT COURT ERRED IN GRANTING APPELLEES' MOTION FOR SUMMARY JUDGMENT AND DENYING APPELLANTS' MOTION FOR THE SAME*

------- ◊ -------

## STATEMENT OF THE CASE[1]

Appellants filed and served a Complaint on September 24, 2019. [Doc. 1]. On October 6, 2019, they amended it to correct certain scrivener's and template errors. [Doc. 5]. The amended complaint prayed for declaratory relief, damages and a permanent injunction against Appellees. Id.. Appellants subsequently filed an emergency motion for preliminary injunction against Appellees. [Doc. 6]. Following a hearing, on October 29, 2019, the court issued an order granting, in part, Appellants' motion. [Doc. 17].

---

[1] *Brevitatis causa*, all citations will omit additional citations and internal quotations unless specifically noted.

See also Reed v. Long ("Reed I"), 420 F.Supp.3d 1365, 1379(IV)(M.D. Ga. 2019).

Appellees filed timely notice of appeal from Reed I in the district court and the case was docketed by this Court. [Doc. 22]. While that appeal was pending, the district court rejected Appellees' unopposed motion to stay discovery during the pendency of that appeal and directed the parties to commence discovery. [Doc. 33]. Meanwhile, the parties timely submitted briefing to this Court in Case 19-14730.

On September 3, 2020, both parties moved the district court for summary judgment and, on October 8, 2020, responded to each other's motion. [Doc.s 50, 51, 55 & 56]. On October 27, 2020, the district court issued an order granting partial summary judgment to Appellees, denying Appellants' motions. [Doc. 58]. Appellees immediately sought reconsideration of the issue on which the district court denied summary judgment. [Doc. 59].

Meanwhile, this Court calendared oral argument in Case 19-14730 for December 15, 2020. Prior to argument, the Court solicited letter briefs from the parties addressing whether the issue before it in Case 19-14730 was now moot based on the district court's denial of a permanent injunction in its summary judgment order. See [Doc. 58]. The Court then ordered Case 19-14730 held in abeyance pending full resolution of the parties' summary judgment motions. The same day, the district court granted Appellees' motion

for reconsideration, then granted them summary judgment on the one issue outstanding. [Doc.s 61, 62]. <u>See</u> <u>Reed II</u>, <u>supra</u>. The court's order cleared the way for Appellants to file a timely notice of appeal on January 8, 2021. [Doc. 65].

This matter was docketed by the Court on January 8, 2021. On January 14, 2021, the Court granted Appellants an extension to submit their opening brief and appendix. Appellants request that the Court take judicial notice of the proceedings in Case 19-14730, which remains in abeyance, and adopt and incorporate all arguments and citations of authority in that case which are relevant to the present proceedings as if set forth, *verbatim*, in this brief. <u>See</u> <u>e.g.</u> <u>United States v. Rey</u>, 811 F.2d 1453, 1457(I) n.5 (11th Cir. 1987).

### STATEMENT OF FACTS

During the Halloween season in 2018, the Butts County Sheriff's Department ("BCSD") instituted a policy of placing signs in front of the homes of every registered sex offender in the county stating: "Warning: No Trick-or-Treating … A Community Safety[2] Message … Sheriff Gary Sheriff Long." <u>See</u> <u>Reed II</u>, 2020 WL

---

[2] Implementation of the Halloween Yard Sign policy ("policy") was not based on any individualized determination of danger posed by a registrant to the community, nor any process or analysis which would determine whether a residence was unsafe, as stated on the signs. <u>Reed I</u>, 420 F.Supp.3d at 1377(III)(C)(1). Instead, Appellees represented that the policy was, "an across the board placement of signs except for [registrants] in prison." <u>Reed I</u> at 1371-72(I).

at *2(I).[3] Registrants and their families had no right to deny the BCSD access to their properties to affix the signs. [Doc. 20 at 47; 55]. A leaflet warned residents of these homes that tampering with the signs was a criminal offense. See Reed II at *2(I). Petitioner-Appellant Reginald Holden verified that this warning was real, as he:

> told [Respondent-Appellee Deputy Jeanette] Riley the Sheriff's Office had no right to place the sign in his yard and that he had removed the sign. Riley responded that movement of the sign or destruction of the sign would be considered destruction of county property and that [Holden] could be arrested. Holden put the sign back up. Reed II at *2(I).

At the injunction hearing, Sheriff Long was asked, "could a registrant have placed a sign next to yours that said, 'disregard and come on and trick-or-treat?'" [Doc. 20 at 47]. He responded, "[n]o," without elaboration. Id.. Almost a year later, Sheriff Long tendered a declaration, signed on September 1, 2020, which

---

[3] Sheriff Long used Facebook, which is only available on the internet, to clarify that registrants lived in the locations where the signs were placed because it was, "an effective way of quickly and widely spreading information which [he] wish[ed] members of the community to have." [Doc. 20 at 57; 58]. The Facebook post stated:
> my office has placed signs in front of every registered sex offender's house to notify the public that it's a house to avoid. Georgia law forbids sex offenders from participating in Halloween, to include decorations on their property … Make sure to avoid houses which are marked with the attached posted signs in front of their [sic] residents. [Doc. 12-8].

Sheriff Long readily conceded that, contrary to his Facebook post, no law prevents registrants from participating in Halloween. [Doc. 20 at 57; Doc. 12-8].

claimed that the BCSD has "no … prohibition on signage on private property that complies with state law and local ordinances," and that, "[h]ad any sex offender registrant placed his own sign relating to the Sheriff's Office sign, any response by the Sheriff's Office would have involved review of applicable law and consultation with a competent attorney." [Doc. 51-2, ¶¶4-5]. Sheriff Long also attempted to explain the about-face from his injunction hearing testimony:

> [a]t the October 2019 hearing in this case, I answered 'no' to whether 'a registrant [could] have placed a sign next to [the Sheriff's Office warning sign] that says, 'disregard and come on and trick-or-treat'? I answered 'no' because Sheriff's Office signs were supposed to be placed on public right-of-way, and my understanding is that citizens cannot place signs on public right-of-way without permission from the entity which owns the right-of-way. Local code enforcement officers routinely remove signs placed on public rights of way in Butts County. [Doc. 51-2, ¶6].

Sheriff Long instituted the policy because of the cancellation of an annual Halloween event where he estimated that, "two and three thousand children … would come through the square" in the City of Jackson. [Doc. 20 at 38-39; Doc. 46 at 27-28]. The intention of the policy was, "to alert the public as to where registered sex offenders live" and "to associate these signs with the registrants who lived on the properties." [Doc. 20 at 46, 58, 84]. Pursuant to Georgia law, Butts County's Sex Offender Registry ("Registry") is published on the internet and at several county buildings. [Doc. 20 at 60-61]. Nothing in the Georgia Code requires registrants to

place signs or other materials at their residence directly or indirectly identifying themselves as sex offenders. [Doc. 40 ¶53]. See also Reed I at 1372(III)(A).

Sheriff Long felt the policy was necessary because children would be trick-or-treating in neighborhoods and because of concern that "very rural parts in our county" did not have access to the Registry. Id. at 1378(III)(C)(2). Sheriff Long testified that he is obliged to, "notify the public of the presence of sex offenders," and that the signs are, "an extension of the notifications we already do to warn the public." [Doc. 20 at 42; 50]. Yet Sheriff Long confirmed that there have not been "any problems with [Butts County's] registered sex offenders on Halloween" since he took office in 2013. Reed I at 1371(I). Sheriff Long stated his intent to implement his policy again in 2019 and beyond. [Doc. 20 at 46].

Riley and Deputy Scott Crumley were tasked with entering each registrant's property, placing the signs and distributing the flyers. See [Doc. 20 at 70; Doc. 40 ¶¶2; 5, 6, 28; Doc. 46 at 10]. They did so the week prior to October 31, 2018. See [Doc. 40 ¶¶17, 25, 34]. Both were wearing official attire, including badges, weapons and handcuffs, which clearly identified them as Sheriff's deputies. [Doc. 20 at 86; Doc. 46 at 10-11; 12-13]. The deputies did not have permission to come onto any of the Appellants' property to place the signs. [Doc. 49 at 18; Doc. 47 at 14; Doc. 48 at 15].

Riley confirmed that the signs were affixed, "as close to the roadway as I could so they could be seen from both ways," claiming that they were placed in rights-of-way. [Doc. 20 at 81]. Prior to going to registrants' homes, the deputies did not research property lines to assure the signs were placed on rights-of-way, as opposed to private property. [Doc. 46 at 14]. Instead, the deputies haphazardly placed signs "in the general vicinity within probably 2 feet front or back of the mailbox or next to the driveway." [Doc. 46 at 14]. It is also undisputed that the BCSD did not document where they placed signs so as to confirm that they were in rights-of-way, as opposed to private property. See Reed II at *6(B)(2).

Petitioner-Appellants Reed, Holden and McClendon (collectively "Appellants") are all required to register and abide by the laws of the State of Georgia pertaining to registered sex offenders. See O.C.G.A. §42-1-12, et seq.. See also Reed II at *1(I). None has been classified by the Sexual Offender Registration Review Board (SORRB) as having a heightened risk of recidivism. See Reed I at 1368(I).[4] Each Appellant has the authority to exclude people from his residence and none of them allows the general public access to his property for the purpose of displaying signs or messages. [Doc. 20 at 14, 32; Doc. 49 at 21-22; Doc. 53-3 ¶7].

---

[4] The district court concluded that Appellants "have been rehabilitated and are leading productive lives." See Reed II at *1(I). Nothing in the record would dispute that conclusion.

Nonetheless, at Sheriff Long's direction, Riley and Crumley entered each Appellant's property without permission and placed a sign thereon. [Doc. 40 ¶65]. Each Appellant objected to this trespassing placement of the signs, but were threatened with consequences (which they understood to mean arrest) if they removed, contradicted, defaced or even just obscured the signs. [Doc. 40 ¶35; Doc. 20 at 24, 32; Doc. 47 at 15; Doc. 46 at 16-17; 50-3 ¶8]. The signs made Appellants concerned for their safety, as well as the safety of their families and property. [Doc. 20 at 16, 33; Doc. 49 at 21, 45; Doc. 47 at 26-27]. After Appellants and/or their agents informed Appellees that they were not permitted to enter their property, on or about November 1, 2018, Riley and Crumley again entered the property to collect the signs. [Doc. 40 ¶¶21, 30, 37, 67; Doc. 20 at 13].

### STANDARD OF REVIEW

"We review the district court's grant of summary judgment *de novo*. The same plenary standard applies to questions of constitutional law. In reviewing the parties' cross-motions for summary judgment, we draw all inferences and review all evidence in the light most favorable to the non-moving party.

There is an additional twist to these standards of review in the First Amendment context. Because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace ... we must thus decide for ourselves whether a given course of

conduct falls on the near or far side of the line of constitutional protection." <u>Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale</u>, 901 F.3d 1235, 1239–40(II)(11th Cir. 2018).

------- ◊ ------

## SUMMARY OF THE ARGUMENT

The district court erred in granting Appellees' motion for summary judgment and denying Appellants' motion because it misapplied the Supreme Court's standards for determining whether Appellees' signs were compelled speech. The district court erroneously used endorsement as a decisive element in the compelled speech analysis because compelled speech can be proven without showing endorsement. <u>See</u> <u>Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.</u>, 487 U.S. 781, 798(III), 108 S. Ct. 2667, 101 L.Ed.2d 669 (1988). Regardless of whether a citizen endorses a message, forcing her to host – or respond to – a message with which she disagrees violates her autonomy over what she chooses to say and not to say. <u>See</u> <u>Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.</u>, 515 U.S. 557, 573(III)(C), 115 S. Ct. 2338, 132 L.Ed.2d 487 (1995).

The signs deprived Appellants of their autonomy to determine what they would and would not say on their own property. No Court has ever found such government-dictated expression to be constitutionally tolerable. Neither the views of reasonable third-party observers, nor Appellants' opportunity to respond to the

signs with their own messages are relevant; the determinant factors are that the message interfered with Appellants' desire to live quietly and in seclusion and that Appellants objected to the message, but were nonetheless compelled to host it, which triggers strict scrutiny. The policy cannot survive heightened review because, among other reasons and by Sheriff Long's own admission, it is an "extension" of O.C.G.A. §42-1-12(i)(5), which represents the least restrictive means of alerting the public as to where registrants live in Butts County.

------- ◊ -------

## ARGUMENT & CITATION OF AUTHORITY

*I. THE DISTRICT COURT ERRED IN GRANTING APPELLEES' MOTION FOR SUMMARY JUDGMENT AND DENYING APPELLANTS' MOTION BECAUSE THE SIGNS ARE COMPELLED SPEECH*

### A. The District Court's Order Concerning Compelled Speech

"It is … a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." Agency for Int'l Development v. Alliance for Open Soc'y Int'l, Inc., 570 U.S. 205, 213(III), 133 S. Ct. 2321, 186 L.Ed.2d 398 (2013). See also Pacific Gas & Elec. Co. v. Pub. Utilities Comm'n of Ca. ("PG&E"), 475 U.S. 1, 11(III)(A), 106 S. Ct. 903, 89 L.Ed.2d 1 (1986). A "state measure which forces an individual, as part of his daily life … to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable" violates the First Amendment. Wooley v.

_Maynard_, 430 U.S. 705, 715(A)(10), 97 S. Ct. 1428, 51 L.Ed.2d 752 (1977).

Guided by the Tenth Circuit's holding in _Cressman v. Thompson_ ("_Cressman II_"), 798 F.3d 938, 951(IV)(A)(10th Cir. 2015), the district court employed a test far more categorical[5] than any the Supreme Court or Eleventh Circuit has ever applied in a compelled speech case. _Cf_. _Wooley_, 430 U.S. at 715(A)(10). _See also_ _Coleman v. Miller_, 117 F.3d 527, 531(III)(11th Cir. 1997).

The district court acknowledged that the first two _Cressman II_ elements were satisfied. _See_ _Reed II_ at *10(III)(C). Its summary judgment decision turned largely on its holding that Appellants were not, "closely linked with the expression in a way that makes [them] appear to endorse the government's message." _Reed II_ at *12(III)(C). The lack of appearance of endorsement, coupled with Appellants' alleged right to respond to the signs' message, were deciding factors in the summary judgment analysis. The court reasoned that, if Appellants had the right to put up their own countervailing signs, "no reasonable observer could conclude that Plaintiffs appear to endorse the signs." _Id_. at *12(III)(C). But see _PG&E_, _supra_.

---

[5] _Cressman II_'s test required establishing "(1) speech; (2) to which he objects; that is (3) compelled by some governmental action." 798 F.3d at 951(IV)(A).

**B. Compelling Appellants To Host The Signs Interfered With Their Autonomy Over What They Wished To Convey – Or Not Convey – To The Community And Thus The Signs Were Compelled Speech**

    **1. The First Amendment assures speaker autonomy which includes her decision to choose the content of messages she hosts, especially at home**

The compelled speech analysis turns on whether the government has violated a speaker's "autonomy to choose the content of his own message." <u>Hurley</u>, 515 U.S. at 573(III)(C). Irrespective of the appearance of endorsement, speech is compelled when government action violates a speaker's autonomy to speak – or not speak - on a given issue, particularly on her own property. <u>See</u> <u>Hurley</u>, 515 U.S. at 573(III)(C). <u>See also</u> <u>Wooley</u>, 430 U.S. at 715(A)(10). Thus, the district court erred by failing to recognize Appellants' right to autonomy not to speak to the public on their own property and the interference with that right the signs engendered. <u>See</u> <u>PG&E</u>, 475 U.S. at 11(III)(A).

That speakers have autonomy over the content of their speech is a, "fundamental rule of protection under the First Amendment." <u>Hurley</u> at 573(III)(C). The, "choice of a speaker not to propound a particular point of view … is presumed to lie beyond the government's power to control." <u>Hurley</u>, 515 U.S. at 575(III)(C). <u>See</u> <u>also</u> <u>Riley</u>, 487 U.S. at 795-97(III). Likewise, "when dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced,"

including the right not to be compelled to respond to government assertions about the speaker, "the speaker's right to autonomy over the message is compromised." Hurley at 575-76(III)(C). See also Wooley, 430 at 715(A)(10). See also PG&E, 475 U.S. at 16(III)(B). Sheriff Long's policy violated Appellants' autonomy in each of these ways.

> **2.** **The First Amendment protects speakers' decisions as to which messages to host, particularly at home**

>> **a.** **speakers are most protected at home (location, location, location)**

The First Amendment affords its greatest protection to speakers on their own property. City of Ladue v. Gilleo held:

> [d]isplaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means. *Precisely because of their location*, such signs provide information about the identity of the speaker.(emphasis added) 512 U.S. 43, 56-57(IV), 114 S. Ct. 2038, 129 L.Ed.2d 36 (1994). Accord Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 811(V), 104 S. Ct. 2118, 80 L.Ed.2d 772 (1984).[6]

Thus, "[a] special respect for individual liberty in the home has long been part of our culture and our law" and the Supreme Court

---

[6] Accord Spence v. Washington, 418 U.S. 405, 409, 411(II), 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974). Appellants are not aware of any case where the United States Supreme Court has held that a speaker is compelled to broadcast the government's message from her own property, as Appellees have sought to do here. But see Wooley, supra; Hurley, supra, and PG&E, supra (collectively) (denying government the right to compel speech on private property).

has applied a particularly exacting level of scrutiny to government actions regarding speech at the home, since the speech is inexorably linked with the resident. <u>City of Ladue</u>, 512 U.S. at 58(IV).

### b. *hosts on private property typically prevail*

"From the beginning, [the Supreme] Court's compelled-speech precedents have rejected arguments that would resolve every issue of power in favor of those in authority." <u>Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n</u>, ___ U.S. ___, 138 S. Ct. 1719, 1744(II)(B)(1), 201 L.Ed.2d 35 (2018)(Thomas, J. concurring). When the government attempts to compel private individuals to host its message on their property, the Court typically sides with the host:

- <u>Wooley</u> required a car's owners to host a government message, affixed to a license plate, to which they objected, forcing them, "to be an instrument for fostering public adherence to an ideological point of view [they] find[] unacceptable." 430 U.S. at 715(A)(10). Because the government forced the speakers to "use their private property as a mobile billboard for the State's ideological message or suffer a penalty," it violated their First Amendment rights. <u>Wooley</u> at 715(A)(11);

- in <u>Hurley</u>, the Court decided that Massachusetts could not, "require private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey." 515 U.S. at 559. It reasoned that forcing the parade to include marchers with whose message they disagreed "produced an order essentially requiring petitioners to alter the expressive content of their parade." <u>Hurley</u> at 573(III)(C). This violated "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." <u>Id</u>. and

- in <u>PG&E</u>, a plurality of the Court held that the utility could not be compelled to make available, "the space remaining in [their] billing envelope, after inclusion of the monthly bill

and any required legal notices, for inclusion of other materials" to "help spread a message with which it disagrees." 475 U.S. at 6-7(I). The Court reasoned that requiring PG&E to do so, "penalizes the expression of particular points of view and forces speakers to alter their speech to conform with an agenda they do not set." Id. at 9(III)(A).

Once "the complaining speaker's own message [is] affected by the speech it was forced to accommodate," the government has violated the speaker's First Amendment rights. Rumsfeld, 547 U.S. at 63(III)(A)(2). From the foregoing, one may conclude that in order to compel that complaining speaker to host its message at her home, the government faces a high constitutional bar which it will normally not be able to clear. See Wooley, supra. See also City of Ladue, supra.

> ### c.  the signs interfered with Appellants' desire to live quietly and in seclusion

This case presents a scenario far more egregious than PG&E, Hurley or even Wooley because the violation occurred at Appellants' homes.

Appellants have each lived a secluded, "law-abiding" life since being compelled to register. Reed I at 1367. According to the district court, they, "have been rehabilitated and are leading productive lives." Id.. Reed spoke for the group in explaining his desire to live quietly in Butts County and be left alone: "I relocated to this state to start a new life and to leave everything behind good or bad and to live peacefully and quietly and to be a good citizen." [Doc. 49 at 43-44]. Reed, "just want[s] to live

peacefully," and, "to have a – a quiet life and be a good citizen and pay taxes." Id. at 49; 52. See also [Doc. 20 at 13; 16]; [Doc. 47 at 28]. Each Appellant disagreed with the message on the sign and none, understandably, cared to speak about their criminal past with their neighbors and other strangers. See [Doc. 20 at 16]. For each Appellant, his home represented a safe place where he could define his life in the way he chose. See [Doc. 49 at 44].

Solely because of the signs, each Appellant was compelled to violate that tranquility by disclosing the most embarrassing fact about his past on his front lawn. The sign was their introduction to neighbors who did not know them, forced them to endure the strong risk of stigma and ostracism within their community and placed their homes and families at risk of vandalism, criminal behavior and/or retaliation. The signs carrying Sheriff Long's "ideological point of view" were positioned with the intention of giving them maximum visibility to the surrounding community, amplifying the embarrassment and disquietude for Appellants and their families. Wooley at 715(A)(10). See also [Doc. 20 at 81]. The signs also communicate two facts that are slanderously untrue or, at best, unproven: Appellants' homes are unsafe and Appellants themselves are not currently law-abiding citizens.

The signs "compromised" Appellants' "right to autonomy over the message" which they wished to communicate to the surrounding community, i.e. that they wished not to speak and preferred to be

left alone to live quietly. <u>Hurley</u> at 575–76(III)(C). Depriving Appellants of that autonomy by forcing them to host an objectionable message obliterated any opportunity Appellants had to define themselves and their character to the communities in which they lived. <u>Id</u>..

The intrusion in this case was far greater than those present in <u>PG&E</u>, <u>Hurley</u> or even <u>Wooley</u> because Appellants were forced to host the government's message at home. As in <u>City of Ladue</u>, the Sheriff's action took an, "important and distinct medium of expression" belonging to Appellants and co-opted it. 512 U.S. at 55(IV). The constitutional harm seems even worse in this case, though, because Sheriff Long didn't merely force Appellants not to speak, he forced them to host his own unproven and defamatory message at their homes. This was an egregious violation of Appellants' First Amendment rights.

### 3. *Speakers need not speak at all*

Implicit in the analysis above is that the First Amendment also protects Appellants' right to remain silent and not speak at all. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." <u>Riley</u> at 795(III). "[T]his general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." <u>Hurley</u> at 573(III). <u>See also</u> <u>Riley</u> at 796-98(III).

Whether hosting offending speech or being forced to utter it themselves, the Supreme Court has broadly protected unwilling speakers from government-mandated factual disclosures, especially on their own property. See Riley at 798(III). See also Miami Herald v. Tornillo, 418 U.S. 241, 257(IV), 94 S. Ct. 2831, 41 L.Ed.2d 730 (1974); McIntyre v. Ohio Elections Com'n, 514 U.S. 334, 348(IV), 115 S. Ct. 1511, 131 L.Ed.2d 426 (1995); PG&E, 475 U.S. at 14-16(III)(B); Hurley, supra. This is likely because, "compelled speech presents a unique affront to personal dignity. The decision to withhold speech depends on views and calculations known only to the individual. And since the individual seeks to refrain from speaking, those motivations are all the more obscure, and privately held." Burns v. Martuscello, 890 F.3d 77, 85(I)(2d Cir. 2018).

In isolation, the signs present Sheriff Long's statement of opinion – that Appellants' homes are unsafe - cloaked as fact, validated by the Sheriff's official seal and broadcast from Appellants' front lawns. See Reed II at *2(I). See also Reed I at 1377(III)(C)(1). Coupled with Sheriff Long's Facebook post, the signs present a mixture of fact and opinion: a registrant lives at this address and the address is a threat to community safety. Indisputably, none of the Appellants wished to speak on this subject, i.e. display the signs in front of his home. See [Doc. 49 at 52]; [Doc. 20 at 14, 32-33]. So whether hosting the message or uttering it themselves, whether fact or opinion, Sheriff Long's

placing the signs on Appellants' properties is compelled speech. See PG&E at 16-17(III)(B)&(C). See also Hurley, supra.

> **4.** ***Government actors may not speak in a way that compels citizens to respond when they would prefer to remain silent***

Sheriff Long's epiphanous summary judgment declaration[7] that he would not outright arrest Appellants if they displayed messages on their property competing with his defamatory signs caused the district court to hold that, "[t]he Plaintiffs are free to offer speech competing[8] with the Sheriff's Office's views and to disassociate themselves from those views," concluding that the signs were not compelled speech. Reed II at *10(III)(C), *11(III)(C); PG&E at 15-16(III)(B). See also [Doc. 51-2]. "This reasoning flouts bedrock principles of our free-speech jurisprudence and would justify virtually any law that compels individuals to speak." Masterpiece Cakeshop, Ltd., 138 S. Ct. at

---

[7] The Court should note that Sheriff Long did not actually swear that he would permit registrants to display counter-messaging on their lawns, merely that "any response by the Sheriff's Office would have involved review of applicable law and consultation with a competent attorney." [Doc. 51-2 at ¶5].

[8] The court essentially adopted Justice Rehnquist's dissent in Wooley where he argued, "there is nothing in state law which precludes appellees from displaying their disagreement with the state motto as long as the methods used do not obscure the license plates." 430 U.S. at 722 (Rehnquist, J. dissenting). That this was offered in dissent suggests that the position was considered and rejected as a means of harmonizing the government's message with the First Amendment, and to Appellants' knowledge, has never been used as a basis for finding otherwise unconstitutional compelled speech to be constitutionally sound. Cf. PG&E at 16(III)(B); Wrzeski v. City of Madison, Wis., 558 F. Supp. 664, 669 (W.D. Wis. 1983).

1740 (Thomas, J. concurring). <u>See</u> <u>also</u> <u>Tavoulareas v. Piro</u>, 759 F.2d 90, 133(IV)(9)(D.C. Cir. 1985) <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>Tavoulareas v. Piro</u>, 817 F.2d 762 (D.C. Cir. 1987)(*en banc*)(observing that a party cannot compel another to break their silence, "by holding the sword of defamatory falsehood over his head").

In <u>PG&E</u>, the Supreme Court was concerned, not only with "forced access," but with a party's being compelled to speak *in response to* the message delivered *vis-à-vis* that access.[9] 475 U.S. at 14-16(III)(B). The plurality held, "the State is not free either to restrict speech to certain topics or views or to force appellant to respond to views that others may hold." <u>Id</u>. at 12(III)(A). Had the group seeking access to PG&E's billing envelopes chosen, "for example, to urge appellant's customers to vote for a particular slate of legislative candidates or to argue in favor of legislation that could seriously affect the utility business … appellant may be forced either to appear to agree with [the group]'s views or to respond." <u>Id</u>. at 15(III)(B). <u>See</u> <u>also</u> <u>PruneYard Shopping Ctr. v. Robins</u>, 447 U.S. 74, 99(I), 100 S. Ct. 2035, 64 L.Ed.2d 741 (1980)(Powell, J. concurring). Forcing a party to break their silence on any matter is a First Amendment violation. Otherwise,

---

[9] Harbingering <u>City of Ladue</u>, the Court noted, "[t]his pressure to respond is particularly apparent when the owner has taken a position opposed to the view being expressed on his property." <u>Id</u>. at 15-16(III)(B).

"the government could require speakers to affirm in one breath that which they deny in the next." PG&E at 16(III)(B). See also Masterpiece Cakeshop, Ltd. at 1745(II)(B)(2)(Thomas, J. concurring). "That kind of forced response," PG&E concluded, "is antithetical to the free discussion that the First Amendment seeks to foster." Id..

The district court's reasoning that Appellants' right to respond concomitantly cleansed the stain the policy inflicted on their First Amendment rights, "is badly misguided." Masterpiece Cakeshop, Ltd. at 1744(II)(B)(Thomas, J. concurring). It is problematic because, "[t]he public undoubtedly will assume that Sheriff Long's determination is correct and, just as undoubtedly, the public will assume that this determination is based on some process that yielded a conclusion that, in fact, the Plaintiffs' homes are unsafe." Reed I at 1377(III)(C)(1). It is logical to conclude that Appellants' communities will take their elected Sheriff's word over that of their neighbor, whom they have recently discovered to be a convicted felon on the Registry. "Yet that is not at all what will happen here. There has been no process[10]

---

[10] This points out that Sheriff Long's message that Appellants' homes are unsafe is both baseless and defamatory. See generally, Taylor Bldg. Corp. of Am. v. Benfield, 507 F.Supp.2d 832, 839–40(III)(A)(1) &(2)(S.D. Ohio 2007)(holding that statement that home was "not safe for human habitation" was libelous and defamatory). See also Dinges v. Tollenaar, ___ N.W.2d ___, 2002 WL 1840874 at *2(II)(B)(Iowa App. 2002)(affirming a jury award for

available to the Plaintiffs to contest Sheriff Long's determination that their homes are unsafe." Id..

If Appellants must respond to disassociate themselves from the message, the damage is already done. Appellants have, "lost control over [their] freedom to speak or not to speak on certain issues." PruneYard Shopping Ctr., 447 U.S. at 99(I)(Powell, J. concurring). Cf. Hurley at 573(III)(C). The signs thwarted Appellants' efforts to live "peacefully and quietly" and any response would merely amplify the attention brought to their homes, further disrupting the tranquility therein. [Doc. 49 at 43-44]. Disassociation with the message is impossible. The signs are carrying a message *about Appellants and their homes* and are posted *directly in front of Appellants' homes*. See [Doc. 12-5-7]. As the district court itself pointed out in Reed I, the imprimatur of the Sheriff's Office juxtaposed with the fact Appellants are convicted felons and registrants, albeit "productive, law-abiding" ones, takes most of the bite out of any response Appellants might wish to offer. See Reed I at 1367.

As such, "[t]he mere fact that [Appellants are] free to dissociate [themselves] from the views expressed on [their] property cannot restore [their] right to refrain from speaking at all." PruneYard Shopping Ctr. 447 U.S. at 99(I)(Powell, J.

---

damages based on statements that Plaintiffs' property "was not safe").

concurring). The opportunity to respond is not a constitutionally sound counterbalance to the harm inflicted on Appellants' autonomy by Sheriff Long when he compels them to display his message. See PG&E at 16(III)(B). The district court thus erred in relying on this fact in its summary judgment decision.

>    ### 5. *The First Amendment distinguishes venues which host a variety of viewpoints from private properties like Appellants' homes*

The fact that the signs interfere with the message which Appellants wish to express (or not express) to their communities distinguishes this case from Rumsfeld. There the Court held that a law school's, "accommodation of a military[11] recruiter's message is not compelled speech because the accommodation does not sufficiently interfere with any message of the school." 547 U.S. at 65(III)(A)(2). Rumsfeld was analogous to PruneYard Shopping Ctr. at 77(I), in that both were places where the property owner was not attempting to communicate a message of its own. See Rumsfeld at 65(III)(A)(2). See also Masterpiece Cakeshop Ltd. at 1745(II)(B). Those cases were thus distinguished from those where, "the complaining speaker's own message was affected by the speech it was forced to accommodate." Id. at 63(III)(A)(2). The distinction is key here since Appellants have already shown, *supra*,

---

[11] The Supreme Court noted the unique circumstances under which it considered Rumsfeld, which are not present here. See Rumsfeld at 58(III)(noting "judicial deference … is at its apogee when Congress legislates under its authority to raise and support armies").

that the signs "affected" their preference live quietly and not speak. Id..

Appellants' front lawns are not "marketplace[s] for ideas of others" like a law school or a shopping center. PruneYard Shopping Ctr. at 97(I)(Powell, J. concurring). The fact that a shopping center "by choice of its owner is not limited to the personal use of appellants" and is, "open to the public to come and go as they please" assures that the owner will not be associated with any particular viewpoint because it is a venue for public discourse. PruneYard Shopping Ctr. at 87(V). Cf. Rumsfeld at 62(A)(1)(noting that a school's speech is only "compelled" if, and to the extent, the school provides such speech for other recruiters). Also, in neither of those cases did the government, "dictate the content of the speech at all." Id.. See also PruneYard Shopping Ctr. at 87(V)(holding "no specific message is dictated by the State to be displayed on appellants' property"). Here the opposite is true: the message on Appellants' lawns is "dictated by the State." Id..

The signs' message is not intermingled with diverse opinions expressed on Appellants' lawns. At each Appellant's home, there is only *their* opinion, generally expressed as silence. What Appellants choose to display – and not display – at their homes is therefore, "inherently expressive," and those expressions – or lack thereof – are inevitably and closely associated with them.

Rumsfeld at 64(III)(A)(2). See also City of Ladue at 56-57(IV).

Therefore neither Rumsfeld, nor PruneYard Shopping Ctr. dictates

the result in this case.

> **C.** **The District Court's Authorities Did Not Require**
> **Appellants To Appear To Endorse The Signs' Message In**
> **Order To Prove A First Amendment Violation**

> **1.** **_Cressman II_ presumed a close association between**
> **the citizen's property and the government message**
> **to which he did not object**

The district court relied heavily on Cressman II which, the

court held, "clearly used an endorsement test." Reed II at

*11(III)(C).[12] The district court also determined that Cressman II

used a "reasonable observer" test to determine whether such a close

---

[12] The district court suggested that Justice Rehnquist's Wooley "dissent and subsequent courts have interpreted it as applying an endorsement test." Reed II at *12(III)(C). The only Court cited by the district court as relying on that interpretation was the Cressman II panel. Id.. "But as Justice Rehnquist recognized," the Ninth Circuit wrote in Frudden v. Pilling, "this is not the test." 742 F.3d 1199, 1205(I)(B)(1)(9th Cir. 2014). "[T]he test is whether the individual is forced to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." Frudden, 742 F.3d at 1205(I)(B)(1). In fact, in Cressman v. Thompson ("Cressman I"), 719 F.3d 1139, 1157(II)(B)(2)(b) (10th Cir. 2013) a different panel on the Tenth Circuit noted:
> [i]n his Wooley dissent, then-Justice Rehnquist said he
> did not agree with the majority's 'fiction' that
> drivers, by virtue of displaying a state motto on their
> license plates, were affirming or professing a belief in
> the motto. The Defendants here essentially ask us to
> adopt this position. However persuasive that may be, we
> have seen no indication that the Court has adopted this
> analysis and overruled or limited Wooley. 719 F.3d at
> 1157(II)(B)(3).

To say, then, that that Court interpreted Wooley "as applying an endorsement test" and that test would prevent Appellants in this analogous case from getting relief is inaccurate. Reed II, supra.

link existed and incorporated the same into its analysis. See Reed II at *10(III)(C), *11(III)(C).

### a.  the Supreme Court has found compelled speech without considering endorsement

Compelled speech cases typically involve one speaker bearing another's message, so association matters, but as Riley, Wooley and even Cressman II indicate it matters as a *factor* in determining whether or not the speech was compelled, not a stand-alone element. Compelled speech can be proven by showing a close association without the element of endorsement and irrespective of what a third party may perceive. See Riley, 487 U.S. at 798-800(III). In Riley, the Supreme Court held that forcing professional fundraisers to make certain "statements of fact" was, "a form of compulsion" which "burdens protected speech." 487 U.S. at 797-98(III). There was no discussion of whether or not the appellant in that case endorsed the compelled speech because it is not possible to endorse a factual statement as one might an opinion. Yet the Court concluded that "a law compelling" the disclosure of certain facts by professional fundraisers in North Carolina, "would clearly and substantially burden … protected speech." Id. at 798(III). Riley, then, illustrates that the Supreme Court does not require so much as the appearance of endorsement to find compelled speech.

### b. the reasonable observer test is irrelevant in a pure speech case

*Cressman II*'s invocation of the reasonable observer was unique to its facts[13] and the majority held that third-party interpretations would not "matter in the compelled-speech context if we were dealing with pure speech," as the district court was here. 798 F.3d at 962(VI)(C)(2). Acknowledging the similarities between its own facts and *Wooley*, *supra*, the *Cressman II* Court also tacitly acknowledged that since "a vehicle is readily associated with its operator" association was not a contentious issue in the case. *Id* at 951(IV)(A). So the district court's application of a reasonable observer test to the facts in this case, which involves pure speech, was simply incorrect.

### c. close association is sufficient in the compelled speech analysis

Justice Powell's concurrence in *PruneYard Shopping Ctr.* explains why endorsement need not be proven in a compelled speech case: "the right to control one's own speech may be burdened impermissibly even when listeners will not assume that the messages expressed on private property are those of the owner." 447 U.S. at 100(I)(Powell, J. concurring). "Thus," Justice Powell noted with

---

[13] The Court concluded that the license plate's *symbolic message*, gleaned from the view of reasonable observer, "is one to which Mr. Cressman emphatically does not object." *Cressman II* at 950-51(IV), 961(IV)(C)(4). The Court's decision had nothing to do with close association, but instead asked what a reasonable observer's interpretation of the symbol on Mr. Cressman's license plate would be, then considering whether or not he endorsed that speech.

prescience, "a law that required homeowners to permit speakers to congregate on their front lawns would be a massive and possibly unconstitutional intrusion into personal privacy and freedom of belief." Id. at 100(I) n. 4.

Wooley also illustrates this point well. 430 U.S. at 715(A)(11). It is difficult to imagine that any citizen of New Hampshire in the 1970s would see a license plate that they saw on dozens of vehicles a day and conclude that Maynard was endorsing the message thereon. Even so, having a license plate with offensive messaging affixed to his car forced Maynard, "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." 430 U.S. at 715(A)(10). Even without an express or implied endorsement, this was constitutionally intolerable.

The Cressman II Court, like Wooley, never questioned that having the government's message affixed to a citizen's personal property "closely linked" that citizen to the message for First Amendment purposes. Cressman II at 948-49(III)(B). It is perplexing, then, that the district court would cite it as using an "endorsement test" for compelled speech which Appellants could not satisfy. The signs were affixed to land[14] which abutted

---

[14] As the Supreme Court indicated in City of Ladue, signs placed in front of a residence create an intimate connection between the message and the resident whereas fora open to the public for expression of ideas therein lack the same and are less fortified

Appellants' private property in the same way a government-owned license plate abuts a citizen's vehicle. Cf. Wooley, supra; Cressman II, supra. Analytically, there is little to no difference.

Because the message on the signs was pure speech, not a symbol, the ubiquitous reasonable observer's opinion as to whether the signs were closely associated with Appellants is irrelevant. See Cressman II at 962(VI)(C)(2). Instead, as in the license plate cases, close association is not an obstacle to Appellants' proving compelled speech because Appellants were each, "forced to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable" at their homes, rather than in their cars. Wooley at 715(A)(10).

---

against compelled speech. Compare City of Ladue, 512 U.S. at 56–67(IV) with PruneYard at 77(I). See also PG&E at 15-16(III)(B). Here, the location of the signs gives their message meaning. If the signs were not placed in front of Appellants' homes, their message would have been significantly diluted. For example, if the signs were in Appellants' backyards, passersby would generally not see them and not perceive that those particular homes were unsafe. The same would be true if the signs were placed in an open field down the road. This is why registrants were threatened with arrest if they moved or obstructed the signs. See Reed I at 1370(I). See also [Doc. 20 at 47]. The location of the signs was as consequential as the message thereon. Cf. Masonry Building Owners of Oregon v. Wheeler, 394 F.Supp.3d 1279, 1295(I)(D. Oregon 2019)(noting, "[a]lthough the Ordinance is a government-mandated script for placard and lease applications, the government itself is not the speaker").

### 2. Compelled subsidy cases are of limited relevance

### a. *Johanns is not instructive to this case*

The district court also cited Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 125 S. Ct. 2055, 161 L.Ed.2d 896 (2005), to support its endorsement standard, but it is distinguishable. Johanns declared that the Court had:

> sustained First Amendment challenges to allegedly compelled expression in two categories of cases: true compelled-speech cases, in which an individual is obliged personally to express a message he disagrees with, imposed by the government; and compelled-subsidy cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity. 544 U.S. at 557(I)(B).

Johanns, for the first time, "considered the First Amendment consequences of government-compelled subsidy of the government's own speech." 544 U.S. at 557(I)(B).

This case is not a compelled subsidy case. Unlike those cases, Appellants have been, "obliged personally to express a message he disagrees with, imposed by the government." Id.. The economic rationales driving decisions like Johanns and Glickman v. Wileman Bros. & Elliott, 521 U.S. 457, 470(IV), 117 S. Ct. 2130, 138 L.Ed.2d 585 (1997) are not before this Court.

Additionally, Johanns noted:

> the beef advertisements are subject to political safeguards more than adequate to set them apart from private messages. The program is authorized and the basic message prescribed by federal statute, and specific requirements for the promotions' content are imposed by federal regulations promulgated after notice

and comment. The Secretary of Agriculture, a politically accountable official, oversees the program, appoints and dismisses the key personnel, and retains absolute veto power over the advertisements' content, right down to the wording. And Congress, of course, retains oversight authority, not to mention the ability to reform the program at any time. <u>Johanns</u> at 563-64(III)(B).

These "safeguards" are not at all present here, underscoring the fact that Sheriff Long took the law into his own hands and did not act pursuant to any statutory authority. The signs' message is by no means, "prescribed by [state] statute," nor are the "specific requirements for the [signs'] content … imposed by [state] regulations promulgated after notice and comment." <u>Id</u>.. Far from it. This is a program designed and curated by Appellees with no legislative "oversight authority" at all. <u>Id</u>..

As the district court noted in passing, Justice Thomas's concurrence in <u>Johanns</u> has *some* relevance here. <u>See</u> <u>Reed II</u> at *11(III)(C). Justice Thomas observed that, "[t]he government may not, consistent with the First Amendment, associate individuals or organizations involuntarily with speech by attributing an unwanted message to them, whether or not those individuals fund the speech, and whether or not the message is under the government's control." <u>Johanns</u> at 568 (Thomas, J. concurring). Doing so would give a party, "a valid as-applied First Amendment challenge," but in <u>Johanns</u>, "[t]he targeted nature of the funding is also too attenuated a link." <u>Id</u>..

The district court complained that Appellants failed to show how Appellees attributed the message on the signs to them, but was seemingly ignoring the forest for the trees. See Reed II at *11(III)(C). "Sheriff Long, without any authority, wants to put his speech in front of the Plaintiffs' homes, which are *obviously linked to their identities*, not the Sheriff's." (emphasis added) Reed I at 1377(III)(C)(1). The location of the signs "associate[d Appellants] involuntarily with speech by attributing an unwanted message to them." Johanns at 568. See also City of Ladue, supra; PG&E, supra.

### b.   *United Foods, Inc.* has some relevance

The Court might find better direction for this case in United States v. United Foods, Inc., 533 U.S. 405, 413, 121 S. Ct. 2334, 150 L.Ed.2d 438 (2001), which involved a subsidy paid "by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity" like Appellants. Like Johanns, United Foods, Inc. incorporated economic considerations not relevant here. However, the Court also concluded:

> [b]efore addressing whether a conflict with freedom of
> belief exists, a threshold inquiry must be whether there
> is some state imposed obligation which makes group
> membership less than voluntary; for it is only the
> overriding associational purpose which allows any
> compelled subsidy for speech in the first place. 533
> U.S. at 413. See also Glickman, 521 U.S. at 469(III).

It would be surprising if Appellees attempted to dispute that Appellants' status as registrants was a "state imposed obligation," but even if they did, they would be mistaken. Id..

The undercurrent of _Glickman_ and _U.S. Foods, Inc._ is that a subsidy might be compellable _if_ it generally benefits the group, "bound together and required by the statute to market their products according to cooperative rules," even when some members object.[15] _U.S. Foods, Inc._ at 412. _Cf._ _Glickman_, _supra_. Members must accept the burdens along with the benefits of collective action. That proposition is completely inverted here. Registrants are, "bound together" expressly to _burden_ the group as a whole, Sheriff Long's policy _harms_ that group and most, if not all members of the group (certainly Appellants) object to his doing so. Further, although the policy pertains to registrants as a group, Sheriff Long's actions were not authorized by O.C.G.A. §42-1-12 and thus were not "part of a far broader regulatory system that does not principally concern speech." _United Foods Inc._, 533 U.S. at 413. _See_ _also_ _Reed II_ at *6(IIII)(B)(2) n. 11. Sheriff Long's policy, "is the principal object of the regulatory scheme." _United Foods, Inc._ at 412.

---

[15] _Glickman_ noted that, "since all of the respondents are engaged in the business of marketing California nectarines, plums, and peaches, it is fair to presume that they agree with the central message of the speech that is generated by the generic program." 521 U.S. at 469-70(IV). It is undisputed that Appellants here (and the vast majority of registrants in Butts County) do not agree that their homes are unsafe.

### c.   The district court's standards and conclusions were unsupported

The district court misconstrued *Cressman II*'s standard for close association, which was met when Appellees placed signs in front of Appellants' homes. See *Wooley*, supra. The court also errantly focused on Appellants' opportunity to disagree with the signs and the perceptions of reasonable observers, neither of which is relevant to the compelled speech analysis. See *Masterpiece Cakeshop, Ltd.* at 1744(II)(B).

Sheriff Long chose the location for his unvetted "community safety message" because he knew that placing the signs in front of Appellants' personal property would immediately associate the message with the resident. [Doc. 20 at 46; 58]. This concomitantly destroyed Appellants' autonomy to choose the content of their speech from their homes. See *Hurley*, supra. By simply living in their homes, Appellants, involuntarily "bound together" with other registrants, were forced to act as stationary "billboards" for a message to which each objected. *U.S. Foods, Inc.* at 412; *Wooley* at 711(A)(11). They were therefore sufficiently linked to the message, *vis-à-vis* their private property, to establish a compelled speech violation and the district court erred, as a matter of law, in applying an incorrect standard to its compelled speech analysis, granting summary judgment to Appellees and denying relief to Appellants. See *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1239–40(II).

### D. Rights-of-Way Are Irrelevant To This Court's Analysis

Appellees argued to the district court that they lawfully placed the signs in rights-of-way, hence the signs are government speech, hence the signs are not compelled speech. But see Walker v. Texas Div., Sons of Confederate Veterans, Inc., ___ U.S. ___, 135 S. Ct. 2239, 2246(II), 192 L.Ed.2d 274 (2015)(noting that First Amendment may constrain government speech when it "seeks to compel private persons to convey the government's speech"). See also Reed II at *12(III)(C) n. 19. The implication is that Appellants are not hosting the message, nor compelled to speak or respond to it if the signs are within the artificial boundaries of a right-of-way.

#### 1. Appellees failed to prove that the signs were placed in rights-of-way

The district court noted several times that "as critical as that issue is," the parties had not fully staked out the law pertaining to their respective rights to use rights-of-way, and ultimately concluded that it could not "adjudicate, as a matter of law, any claims or defenses that depend on identifying whether the signs were placed in rights-of-way and what property rights governed the placement of those signs." Reed II at *5(III)(B)(2). See also Reed II at *5(III)(B)(2) n.8; *6(III)(B)(2); *6(IIII)(B)(2) n. 11 & *7(III)(B)(3).

In Reed I, the district court concluded that Appellees, "offer[ed] no evidence or authority to support the conclusion that Sheriff Long, either as the Sheriff or as a private citizen, has the right to place signs on rights-of-way in front of private residences." 420 F.Supp.3d at 1373(III)(B). In Reed II, the Court concluded, "the Defendants have scant authority to support" their dual propositions that the BCSD, "has the right to post the signs in front of the Plaintiffs' homes as long as the signs are in yet to be defined rights-of-way *and* that it can prosecute anyone who moves the signs." 2020 WL 7265693 at *6(III)(B); *13(IV). Appellants agree that Appellees "have not shown a legal basis for their claim that they can post signs in rights-of-way" and believe the compelled speech analysis would be the same if the signs *were* or *were not* actually placed in rights-of-way. Id. at *6(III)(B)(2) n.11.

## 2. *Rights-of-Way are still on Appellants' property*

"Right-of-way" is defined as the "right to pass through the property *owned by another*." (emphasis added) Black's Law Dictionary (10th ed. 2014). Ownership of the fee underlying the right-of-way is evidenced by the fact that, under Georgia law, if the party granted the right-of-way abandons it, the right reverts back to the owner of the adjacent land. See generally Brooks v. Green, 594 S.E.2d 629, 630, 277 Ga. 722 (Ga. 2004). Accord Marvin M. Brandt Revocable Tr. v. United States, 572 U.S. 93, 106(II),

134 S. Ct. 1257, 188 L.Ed.2d 272 (2014). Thus, even if Sheriff Long has a limited[16] right to use a portion of Appellants' property for specified reasons, the underlying fee is nonetheless Appellants' property. See Brooks, 594 S.E.2d at 630. See also Reed I at 1373(III)(B). Rights-of-way are not specially marked or otherwise apparent to a passerby. See [Doc. 20 at 78; Doc. 12-5-7]. To any casual viewer, a right-of-way is indistinct from a front yard. Id..

### 3. The government may not use rights-of-way to create an advantage in expressing its views

Even granting, *arguendo*, that Appellees have a right to place the signs on the rights-of-way, they are still placing the signs on Appellants' properties squarely in front of their homes. Sheriff Long suggested in his declaration that Appellants could attempt to position their own signs outside of the right of way and he would not immediately arrest them therefor. See [Doc. 51-2 at ¶¶4-6]. If Sheriff Long or any government actor insists that Appellants place their signs on "private property," while using the right-of-way in front of that property for the government's message, it would also constitute, "giv[ing] one side of a debatable public question an

---

[16] In Reed I the court noted, "the Butts County Code defines a public right-of-way as a 'strip of land designated, reserved, dedicated, or purchased for the purpose of pedestrian access, vehicular access, or utility line installation.' Those uses concern travel and utility lines; they do not include a space for public announcements or signage." 420 F.Supp.3d at 1374(III)(B).

advantage in expressing its views to the people." <u>City of Ladue</u> at 51(III). Sheriff Long's message would be significantly closer, and thus more available, to its targeted audience – anyone passing by on "the roadway" – than any competing message Appellants might wish to place on their private property, well behind those signs from that same roadway. [Doc. 20 at 81].

Sheriff Long's having exclusive use of the rights-of-way, then, "facilitate[s] speech on only one side of the … debate – a clear form of viewpoint discrimination." <u>McCullen v. Coakley</u>, 573 U.S. 464, 485(III)(B), 134 S. Ct. 2518, 189 L.Ed.2d 502 (2014). Thus the First Amendment does not tolerate the signs, even if placed on rights-of-way.

### 4. *Sheriff Long is not authorized to place these signs in rights-of-way*

O.C.G.A. §32-6-51(a)(1) states:

> [i]t shall be unlawful for any person to erect, place, or maintain within the dedicated right of way of any public road any sign, signal, or other device except as authorized by this subsection or subsection (d) of this Code section or as required or authorized by Code Section 32-6-50 or any other law.[17]

No law authorizes, let alone "require[s]" the BCSD to erect these signs. <u>See</u> <u>Reed I</u> at 1373(III)(B). <u>See also</u> <u>Fortner v. Town of Register</u>, 604 S.E.2d 175, 177, 278 Ga. 625 (Ga. 2004)(holding that a statute must affirmatively authorize use of rights-of-way in

---

[17] O.C.G.A. §32-6-51(d)is inapplicable here.

order for the use to be "authorized" within the meaning of O.C.G.A. 32-6-51(a)(1)).

Appellees will point to O.C.G.A. §42-1-12(i)(5), but that does not authorize Sheriff Long to place signs in front of individual registrants' homes or compel them to host a message that their residences are unsafe. See Reed I at 1372-73(III)(A). See also Fortner, 604 S.E.2d at 177. That law authorizes Sheriff Long to exercise the authority created by O.C.G.A. §§42-1-12(i)(3)(A)-(E) and nothing more. See Yates v. United States, 574 U.S. 528, 563(II)(A), 135 S. Ct. 1074, 191 L.Ed.2d 64 (2015)(Kagan, J. dissenting)(noting that reference statute's language and structure are appropriate to construe arguably ambiguous language in a statute). It does not authorize sheriffs to force registrants to associate themselves with an *ultra vires* declaration that their homes are unsafe.

O.C.G.A. §42-1-12(j)(2) provides context to O.C.G.A. §42-1-12(i)(5). It notes, "[t]he sheriff's office may post the list of sexual offenders in any public building in addition to those locations enumerated in subsection (h) of this Code section," confirming that the preceding subsection contains a plenary list of locations where the sheriff may identify registrants. The subsection authorizes sheriffs to post the "list" of registrants, rather than singling out individuals, as Sheriff Long has, and limits the authority to do so to "any public building" rather than

any publicly visible *location*, like a park, a jogging trail or Appellants' homes.

Nor does the Registry scheme contain any authority for sheriffs to create an affirmative obligation for registrants, like hosting the signs. In fact, registrants have no obligation to inform *the public* of their status at all, merely to keep biographical information current with law enforcement who, in turn, may notify the public. <u>See</u> O.C.G.A. §42-1-12(f).

### 5. *Sheriff Long's interpretation of the statute is expansive*

Sheriff Long's "extension" of O.C.G.A. §42-1-12(i)(5) would allow him or any other sheriff near-limitless authority to "inform the public" in ways Georgia's legislature did not contemplate. Sheriffs could require registrants to wear placards identifying them as unsafe anytime they were outside, affix a scarlet "R" to their clothing to denote their registrant status or, indeed, to have a sign in front of their home, year-round, to inform the public that their house threatens community safety. There is no evidence that Georgia's laws vest Sheriff Long with so much authority, particularly juxtaposed with a citizen's right not to be compelled to speak from her home when she wishes ***not*** to.[18]

---

[18] Should the Court find that Sheriff Long has this authority, it is difficult to find a reason why other Georgia sheriffs might not initiate policies to inform the public of other facts about residents of the State. For instance, if a sheriff were to decide that it was important that members of her community know what

Sheriff Long's position is that he, a government actor, has the authority to "exten[d]" codified law at the expense of private citizens' rights. [Doc. 20 at 42]. This position flips one of the most fundamental principles of the Bill of Rights – protecting individual liberty against government abuse of authority – on its head. See generally U.S. Const. Amend.s I & IX. See also Ga. Const. Art. 9,§1,¶III(a)(stating that sheriff's "qualifications, powers, and duties" are defined by, "general law"). "The Constitution, in its genesis and historical evolution, has been a barrier erected between the individual citizen and collective government for the protection of the rights of the individual citizens against potential abuses of power by the government." Barham v. Edwards, 566 F.Supp. 1497, 1499-1500 (M.D. Tenn. 1983). Since O.C.G.A. §42-1-12(i)(5) does not authorize Sheriff Long to create signs identifying individual registrants' homes, O.C.G.A. §32-6-51(a)(1) is no refuge for him.[19] See Fortner at 177.

---

religion their neighbors practiced (or did not practice) she might place signs with crosses in front of Christians' homes, the Star of David in front of Jewish residents' homes, a crescent moon and star in front of Muslims' homes and so forth. It is difficult to believe the Founders designed the First Amendment to tolerate this, yet the distinction between this action and Sheriff Long's actions is constitutionally negligible.

[19] If Appellees were acting outside of their authority under O.C.G.A. §42-1-12, then the signs were not the government's message, but that of Sheriff Long individually, as compelled under color of law by his deputies, and surely authorizes the Court to conclude he has violated Appellants' rights.

Addressing the district court's concern, then, placing signs in rights-of-way still means placing them on Appellants' property, where they enjoy maximum protection of their First Amendment rights. See City of Ladue, supra. Even a finding that Appellees were authorized to use the rights-of-way would not alter this fact, so as the district court also observed in Reed I, "the fact that the signs are in rights-of-way, rather than a few feet closer to the homes, does not alter the First Amendment issues raised by the posting of the signs." 420 F.Supp.3d at 1374(III)(B).

### E. The Policy Is A Content-Based Restriction On Speech, Thus Strict Scrutiny Applies

Although the district court did not reach the issue, Appellees have previously argued that strict scrutiny does not apply here, analogizing the signs to a warning label. See Discount Tobacco City & Lottery, Inc. v. United States, 674 F.3d 509 (6th Cir. 2012). In that case, the Court held, "[t]he textual warnings … provide undisputed factual information about the health risks of using tobacco products … The health risks of smoking tobacco have been uncovered through scientific study. They are facts." Discount Tobacco City & Lottery, Inc., 674 F.3d at 560(B)(2). In doing so, that case distinguished itself from Entertainment Software Ass'n v. Blagojevich, 469 F.3d 641, 650(II)(C)(7th Cir. 2006), because, by contrast, labelling a video game "sexually explicit" involves reliance on "widely divergent local standards." (internal quotes

omitted) <u>Discount Tobacco City & Lottery, Inc.</u> at 560-61(B)(2).
Thus, where text "provide[s] undisputed factual information," as
opposed to "the government's opinion" about the hazard presented,
a lower standard of scrutiny is merited. <u>Id</u>. at 561(2)(B). The
signs provide only Sheriff Long's opinion that Appellants' homes
are unsafe and certainly not any "undisputed factual information."
<u>Id</u>.. A lower standard is not justified.

Appellees' sign policy "necessarily alters the content of the
speech," and is thus subject to strict scrutiny. <u>Riley</u> at 795,
798(III). Government action which "regulates speech based on its
content … must be narrowly tailored to promote a compelling
Government interest." <u>United States v. Playboy Entm't Group, Inc.</u>,
529 U.S. 803, 813(II), 120 S. Ct. 1878, 146 L.Ed.2d 865 (2000).
<u>Accord</u> <u>Cooper v. Dillon</u>, 403 F.3d 1208, 1215(II)(A)(1)(11th Cir.
2005).

The stated goal of the policy is, "protecting the public from
sex offenders," which is compelling. [Doc. 20 at 112]. <u>See</u> <u>also</u>
<u>Reed I</u> at 13711(C)(2). In fact, Georgia had the *exact same* interest
in creating the Registry scheme, including O.C.G.A. §42-1-
12(i)(3). <u>See</u> <u>Rainer v. State</u>, 690 S.E.2d 827, 830(2), 286 Ga. 675
(Ga. 2010). By definition this, not Sheriff Long's "extension," is
the least restrictive means for achieving the goal of alerting the
public where registrants live. [Doc. 20 at 42; 50]. Sheriff Long
never had a problem with registrants using less bombastic measures

prior to 2018, so the policy was simply unnecessary. [Doc. 20 at 65]. See also Reed I at 1377-78(III)(C)(2).

Sheriff Long testified that the policy "exten[ded]" O.C.G.A. §42-1-12(i)(3) and offered a contrived reason, the lack of availability of internet service throughout the county, for doing so. [Doc. 20 at 42; 59]. See also Reed I at 1378(III)(C)(2) n.9. Sheriff Long used Facebook to announce the policy, agreeing that it was an "effective way to get the word out," and Facebook is only available on the internet. [Doc. 20 at 42; 58; 97; 109]. The 2018 Facebook post was so effective that Sheriff Long testified, "I don't know that we would have to do another Facebook post because this was the first year of the sign. I don't think a Facebook post would be necessary. I think everybody in my community, of course, is aware of the signage." [Doc. 20 at 65].

Since Sheriff Long concedes that the internet is a highly effective means of communicating with county residents and since the Registry is available to residents on the internet, Sheriff Long's policy of compelling Appellants' speech by placing signs in front of their homes is not the least restrictive means for advancing his compelling interest in protecting children and the sign policy fails strict scrutiny. See Playboy Entm't Group, Inc., 529 U.S. at 813(II).

A party may not rely on an affidavit which, "does not clarify, but contradicts" previous testimony to avoid an adverse ruling on summary judgment. <u>Yatzus v. Appoquinimink School Dist.</u>, 458 F.Supp.2d 235, 246-47(IV)(B)(D. Del. 2006). <u>See also</u> <u>Van T. Junkins & Assoc., Inc. v. U.S. Industries, Inc.</u>, 736 F.2d 656, 658 (11th Cir. 1984). <u>Yatzus</u> noted:

> [t]he Court of Appeals for the Tenth Circuit has created a test for determining whether a party's affidavit constitutes an attempt to create sham issues of fact. Relevant factors to consider are whether: (1) the affiant was cross-examined during earlier testimony; (2) the affiant had access to the relevant evidence at the time of the earlier testimony; (3) the affidavit was predicated on newly discovered evidence; and (4) the earlier testimony reflects confusion which the affiant attempts to explain. 458 F. Supp. 2d at 247(IV)(B)(citing <u>Franks v. Nimmo</u>, 796 F.2d 1230, 1237(II)(10th Cir. 1986)). <u>See also</u> <u>Cleveland v. Policy Mgmt. Syst. Corp.</u>, 526 U.S. 795, 806(II), 119 S. Ct. 1597, 143 L.Ed.2d 966 (1999).

Though context indicates that it did so hesitantly,[20] the district court substantially reversed course in these proceedings based almost solely on Sheriff Long's declaration:

> [o]n the issue of injunctive relief,[21] the initial question, then, is whether the record provides evidence

---

[20] Elsewhere the Court stated, "the Plaintiffs *are now* free to disagree with that message by posting competing messages," and, "it has *now become clear* the plaintiffs are free to disassociate themselves or place competing messages." (emphasis added) <u>Reed II</u> at *10-11(III)(C).

[21] Appellants note that the district court denied a permanent injunction as a remedy when it granted summary judgment against them on their First Amendment claims. <u>See</u> *e.g.* <u>Alabama v. U.S.</u>

> that the Sheriff's Office intends to bar the plaintiffs
> from placing competing messages. It does not. *Whatever
> the Sheriff's Office planned to do in 2019, it is clear
> now* it will not attempt to impinge the Plaintiffs' First
> Amendment rights. The Plaintiffs are free to offer
> speech competing with the Sheriff's Office's views and
> to disassociate themselves from those views. (emphasis
> added) <u>Reed II</u> at *10(III)(C). <u>See also</u> [Doc. 51-2].

The factors announced in <u>Franks</u> counsel strongly against the level

of reliance the district court placed in Sheriff Long's

contradictory declaration. Sheriff Long was attempting to blunt an

admission he made on cross-examination at the injunction hearing,

after which Appellees' counsel was given the opportunity to re-

direct and declined. [Doc. 20 at 62]. The district court then

examined Sheriff Long. [Doc. 20 at 63-66]. Counsel for Appellees

followed up on that questioning without seeking to clarify or

amplify his allegedly truncated response to Appellants' question

about dissenting messages. [Doc. 20 at 66].

Since, "the affidavit was [not] based on newly discovered

evidence," Sheriff Long, "had access to the relevant evidence at

the time of the earlier testimony." <u>Franks</u> at 1237(II).

Nonetheless, three hundred thirteen days passed between the

_____

<u>Army Corps of Engineers</u>, 424 F.3d 1117, 1127(II)(11th Cir.
2005)(holding that injunction is a remedy if a plaintiff can
demonstrate violation of an independent legal right). Thus,
reversal of the Court's summary judgment decision would
necessitate reconsideration of its denial of a permanent
injunction as well. This appeal, then, should be understood as
requesting reversal of the district court's summary judgment
decision and its pendant denial of Appellants' request for a
permanent injunction based thereon.

injunction hearing on October 24, 2019, and September 1, 2020,
when Sheriff Long signed his declaration. Sheriff Long did not
explain why he waited just short of a year, during which his
attorney filed supplemental briefing after the injunction hearing[22]
and an appeal of the injunction decision as well as engaged in
ongoing discovery with Appellants, to amplify this crucial piece
of testimony. Cf. United States v. Brugnara, ___ F.Supp.2d ___,
2014 WL 7240678 at *1, *2(1)(N.D. Cal. 2014)(noting that government
submitted post-hearing supplemental briefing opposing a motion and
citing the same); Winningham v. U.S. Dep't of Hous. & Urban Dev.,
371 F. Supp. 1140, 1146(V)(S.D. Ga. 1974), aff'd, 512 F.2d 617
(5th Cir. 1975)(noting that plaintiff filed, "[a]ffidavits
supplementing parts of the testimony" from a hearing that had taken
place approximately a month prior); Christie v. Mazda Motor of
Am., Inc., ___ F.Supp.2d ___, 2006 WL 2128897 at *1 & *8 (E.D.
Tenn. 2006)(noting the court's review of expert's "deposition
testimony, his subsequent affidavit testimony and his testimony
during the Daubert hearing," held seventeen days prior); Wellard
v. U.S. Dep't of Justice, ___ F.Supp.2d ___, 2007 WL 951898, at *1
(D. Idaho 2007)(noting submission of a supportive declaration
"about four days after the hearing"). Sheriff Long's "affidavit

---

[22] As they did at summary judgment, Appellees could have sought
reconsideration of Reed I, buoyed by Sheriff Long's declaration.
Cf. Deimer v. Cincinnati Sub-Zero Products, Inc., 990 F.2d 342,
346(III)(B)(7th Cir. 1993).

was offered only after [a preliminary injunction] had been granted against him on that issue." Franks at 1237(II). What was newly discovered about the information in the declaration was that Reed I relied heavily on Sheriff Long's statement at the injunction hearing that registrants were not free to dissent to rule against him. 420 F.Supp.3d at 1374-1377(III)(C)(1).

Sheriff Long is almost compelled to argue that his, "earlier testimony reflects confusion which [he] attempt[ed] to explain" in his declaration. Franks, supra. Yet:

> [w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony. Van T. Junkins & Assoc., Inc., 736 F.2d at 657.

Sheriff Long expressed no confusion at the question when it was asked and the question itself was unambiguous: "could a registrant have placed a sign next to yours that said, 'disregard and come on and trick-or-treat?'" [Doc. 20 at 47]. Plus, just before his pivotal admission, Sheriff Long was asked if "registrants were allowed to place objects like garbage cans or other signs in front of the signs to obstruct them from public view," then asked if doing so would cause him to arrest a registrant. [Doc. 20 at 46]. He responded, "[n]ot necessarily just covering it up with something. I think what we would handle when we went there is whatever object is out there it's in the public right-of-way and

you can't have stuff piled up in the public right-of-way." [Doc. 20 at 46-47]. That Sheriff Long did not offer the same explanation to the next question, but then *did* offer it a year later after his response proved problematic to the defense, can and should weigh heavily against him. See <u>Franks</u>, <u>supra</u>. If Sheriff Long believed it was the *court* which was confused by his response, then it is difficult to understand why he did not clarify it in a motion for reconsideration at the time, rather than in a motion for summary judgment a year later. See <u>Deimer</u>, 990 F.2d at 346(III)(B).

In <u>Leoncio v. Louisville Ladder, Inc.</u>, 601 F. App'x 932, 933 (11th Cir. 2015) this Court held:

> [a]lthough Mr. Leoncio filed an affidavit stating that he had read the labels, the district disregarded it as a sham affidavit because it was 'in direct contradiction with his earlier deposition testimony' and was not filed until after the defendant moved for summary judgment. The affidavit was filed four months after Mr. Leoncio's deposition and three days before the plaintiffs' response to the defendant's summary judgment motion was due. Mr. Leoncio never attempted to correct his deposition through errata sheets or otherwise.

Sheriff Long's declaration was filed commensurate with Appellants' summary judgment motion and nearly one year after Sheriff Long testified at the injunction hearing. For the same reasons the Court did not credit the affidavit in <u>Leoncio</u>, the district court should not have credited Sheriff Long's declaration and erred when it relied thereon to deny Appellants a permanent injunction. 601 F.App'x at 933.

------- ◊ -------

**CONCLUSION**

**WHEREFORE,** Appellants request that this Honorable Court **reverse** the district court's order granting summary judgment to Appellees and denying the same to appellants as well as its order denying Appellants motion for a permanent injunction and provide any further relief required by the ends of justice.

This 17 day of March, 2021.

Respectfully Submitted,

YURACHEK & ASSOCIATES, LLC

/s/ **Mark Yurachek**
_____
Georgia Bar No. 783599
MARK ALLEN YURACHEK & ASSOCIATES, LLC
1344 Lafrance Street, NE
Suite 3
Atlanta, GA 30307
(470) 319-8721


ESHMAN BEGNAUD, LLC

/s/ **Mark Begnaud**
_____
Mark Begnaud
Ga. Bar No. 217641
ESHMAN BEGNAUD, LLC
315 W. Ponce de Leon Ave
Suite 775
Decatur, GA 30328
(404) 665-9601

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

this brief contains 12,187 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32 (a)(6) because:

this document has been prepared in a monospaced typeface using Microsoft Word in 12 point Courier New.

Respectfully Submitted,

/s/ **Mark Yurachek**
_____
Mark Yurachek
Georgia Bar No. 783599

Attorney for Appellants

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on this 17th day of March 2021, I caused the foregoing to be filed with the Clerk of the Court, via the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that the required paper copies have been dispatched to the Clerk of the Court, via United Parcel Service, for delivery within three business days, and one copy was served upon lead counsel for each separately represented party, addressed as follows:Jason Waymire, Esq.

> Williams, Morris & Waymire, LLC
> Building 400, Suite A
> 4330 South Lee Street
> Buford, Georgia 30518

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

> /s/Denise Dulong
> Denise Dulong
> GibsonMoore Appellate Services, LLC
> 206 East Cary Street
> P.O. Box 1460 (23218)
> Richmond, VA 23219
> (804) 249-7770 – Telephone
> (804) 249-7771 – Facsimile
> denise@gibsonmoore.net